## SCHUYLKILL COUNTY.

JANUARY TERM, 1880, No. 191.                APRIL 20TH, 1882.

# Seitzinger *versus* Marsden *et al.*

1. A coal lease gave a right of way and privilege of erecting a breaker, and provided that the lessees should pay five cents per ton for every ton of coal brought through a certain gangway, that legal process out of any of the courts of this Commonwealth or of the United States should not operate in the transfer of the lease without the consent of the lessor, and that the lease should be forfeited for any breach of the covenants. The title of the lessees became vested in B.

B. took a subsequent lease from the lessors which provided that he should put up engines and machinery at his own expense; that at the expiration of the lease these improvements should be valued by disinterested persons, each party choosing one, and on the award of valuation being made known it should be optional with the lessors to take or refuse to take them at the valuation; that legal process should not effect the transfer of the lease without the consent of the lessors, and that for any breach in these stipulations fifty cents a ton for every ton of coal thereafter taken out should be paid. It also contained a clause of forfeiture in case of the breach of any of the covenants. B. put up improvements, the greater part of them under the prior lease. His interest in the leases and personal property was levied upon and sold by the sheriff to the plaintiffs. The rent due, was claimed from the proceeds of the sale. The lessors refused to recognize plaintiffs as tenants, gave notice of forfeiture for non-payment of rent and breaches of covenant, and took possession. The lessors afterward sold some and removed others of the improvements. There was evidence that the possession was taken upon an understanding that the position of the plaintiffs should be the same as if they had been ousted by force, and that one of the lessors said he would be accountable for all the property. In an action against the lessors the Court charged that by virtue of the sheriff's sale of B.'s personal property the plaintiffs acquired all the right, title, and interest of B. in the property sold. *Held*, that this was correct.

2. The Court further charged the jury, "If you think from the law as explained and the facts that the plaintiffs have established their right to the property sold by the sheriff, and they have satisfied you that the defendant, by his agents or employés, acting within the scope of their authority, received any of this property and converted it to his own use, with a promise to pay for the same, or through fraud or unfair dealing, then he would be liable for the value of so much, if any, of the property which he received, with interest from the time of such conversion." *Held*, to be correct.

3. There was nothing in either of the leases that would have prevented B. from using his property on the demised premises before the sale, nor was there anything to prevent those who succeeded to his title from exercising rights of ownership, after they came into possession as vendees of the sheriff.

4. As against execution creditors of the lessee under the second lease, the lessors' option to buy the tenant's fixtures at the end of the term, gave them no title to such fixtures until they were appraised and accepted.

5. The title of B. in the engines and machinery was personal, and could be taken in execution, notwithstanding the agreement that upon a certain event they might be taken by the landlord upon a valuation, unless that event had occurred.

6. If there was any breach of the tenant's stipulations it resulted from the sheriff's sale, and for it the parties themselves had provided a penalty, to which the lessors should be remitted rather than be permitted to take the property from the sheriff's vendees without compensation.

7. Under the facts of this case the plaintiffs could recover in an action of *indebitatus assumpsit.*

[Seitzinger *v.* Marsden *et al.*]

Before SHARSWOOD, C. J.; and MERCUR, GORDON, TRUNKEY, STERRETT, and GREEN, JJ.

Error to the Court of Common Pleas of *Schuylkill County.*

Assumpsit by Thomas Marsden, James Carr, and George Miles, trustees, against William Wetherill and Jacob J. S. Seitzinger, administrator *de bonis non*, etc., of Jacob W. Seitzinger, deceased, to recover the value of certain personal property alleged to have been taken by the defendants and converted to their use.    There was a return of *nihil* as to Wetherill, and the case proceeded against Seitzinger alone.

The *narr* was in *indebitatus assumpsit*, and contained the common counts for goods sold and delivered, work done, and materials furnished, money lent, money paid for the use of defendants, money had and received, and money found to be due.

On the trial in the Court below before WALKER, J., the following facts appeared:

March 5th, 1853, Wetherill entered into an agreement under seal with Joseph W. Cake, John H. Adams, and John C. Lessig, by which he leased to them "the right of way or privilege of bringing out coal through and over the Ellmaker tract of land . . . with the right of depositing dirt made from coal on the said tract," during the term of ten years.    They were also to "have the privilege of erecting a coal breaker on said Ellmaker tract . . . and such right of way or privilege of bringing through coal shall extend only to all coal brought through the gangway of the mines lately worked on the Ellmaker tract by George Alton & Co."

The lessees covenanted that they would pay five cents per ton for every ton of coal brought through the said gangway, that the lessor should have a right of distress, that they would not "interest any person or persons with them in this lease, excepting George Alton and Benjamin Titus, of the County of Schuylkill, without the consent and approbation of the party of the first part, had in writing for that purpose; nor shall the operation of any legal process out of any of the courts of this Commonwealth, or of the United States, operate in the transfer of this lease, without the consent and approbation of the party of the first part, and for any breach in these stipulations the said lessees shall thereafter, for and during the term hereby granted, in manner aforesaid, pay the sum of ten cents per ton for every ton of coal thereafter brought through or over the land hereby leased."

The lease also contained a clause of forfeiture in case of the breach of any of the covenants.

March 5th, 1853, Cake, Adams and Lessig, the lessees, granted to Benjamin N. Titus and George Alton the right of way through the Ellmaker tract, with the privilege of depositing dirt on the same, and the right to remove all their fixtures within a certain period after the expiration of the lease. Titus and Alton organized a firm of Titus, Alton & Co., and put up a breaker, a double house, office, stable, and blacksmith shop on the tract. They erected a dirt plane, and had in the breaker a twenty-horse-power engine, machinery, screens, and rollers. The rights of the firm became vested in Titus, and in 1856 the sheriff of Schuylkill County levied on the lease and fixtures as the property of Titus, and sold them, November 29th, 1856, to J. H. Adams.

On the 19th of February, 1859, Adams sold the lease and fixtures to William Burton, who, June 10th, 1859, took a lease of the Ellmaker tract from Jacob J. S. Seitzinger, administrator as aforesaid, and William Wetherill, for the term of ten years. This lease provided, *inter alia*, that Burton should have the right to mine coal above and below water level on the Diamond Vein on the said tract; that he should put up necessary steam-engines at his own expense, in substantial houses, "and at the expiration of this lease the engines and machinery shall be valued by disinterested persons, each party choosing one, and on the award of valuation being made known it will be optional with the parties of the first part (lessors) either to take or to refuse to take the engines and machinery at such valuation;" that all the houses and timber-work built by the lessee should, when the lease expired, become the property of the lessors; that the lessee should dig ten thousand tons of coal in each year, and in case of failure should pay the same amount of rent as though he had taken out the full quantity; and in any instance of failure of this stipulation, then at the option of the lessors the lease should be forfeited; that the lessee should pay for every ton of pea coal ten cents, and of all other kinds of coal twenty-five cents; that "this lease shall not be transferred or mortgaged by the lessee, nor shall said lessee interest any person or persons with him in working the mines hereby demised without the consent and approbation of the parties of the first part, had in writing for that purpose, nor shall the operation of any legal process out of any of the courts of this Commonwealth or of the United States effect in the transfer of this lease without the consent and approbation of the parties of the first part," and for every breach in these stipulations fifty cents a ton for every ton of coal thereafter taken out should be paid; that in case the vein should prove so faulty as to make it impossible to mine ten thousand tons,

[Seitzinger *v.* Marsden *et al.*]

the lessee should be released, provided he run one hundred yards of gangway per annum; that the lessors might distrain for arrears of rent; that the "vein in the slope, the screens, turnouts, and all other iron except the railroad iron in the gangways shall at the expiration of this lease be valued by the same persons who affix a valuation to the steam-engine and machinery, and shall in like manner be taken or refused by the parties of the first part;" that if at the expiration of the lease the right to mine out the coal should not be granted to the lessee, the railroad iron in the gangways should be valued and taken or refused, as above provided ; and that for breach of any of the covenants the lease should be forfeited.

Burton put up a hoisting-engine, slope house, hoisting apparatus, forty-horse engine and pump, and sunk a slope. The distance from the foot of the slope to the eastern line of the tract was about 500 or 600 yards, and he drove a gangway in that direction about 225 yards. From the foot of the slope the length of lessee's run to the west was 1000 yards, and he drove a gangway in that direction about 400 or 450 yards. The coal was faulty in both gangways.

December 16th, 1861, the sheriff of Schuylkill County levied on the interest of Burton, in a certain coal lease on land of Wetherill and Seitzinger, having about eight years to run, "together with a frame slope house, with a fifty-horsepower steam-engine for hoisting and pumping, with pump and pumping-rods, gearing, boilers, etc., a frame coal breaker, with a twenty-horse-power steam-engine, with gearing, boilers, etc., a single set of schutes, screens, and rollers, a frame blacksmith shop, frame stable, frame office, frame powderhouse, one block of frame miners' houses, all railroads in and about and connected with the mines; also all the interest of Burton in a coal lease on lands of Joseph W. Cake and John H. Adams, having about eight years to run, together with all the railroads connected with said mines. Also, 16 slope cars, 1 dirt car, 1 mule, 2 stoves, 450 feet of water-pipe," etc.

At the sheriff's sale the plaintiffs bought the railroads, leases, cars, two engines, and breaker, and the implements of the breaker, blacksmith tools and chains, and everything there. They entered into possession and kept the pumps going, but did not mine any coal.

They sold the wagons, and February 17th, 1862, began to take the railroad iron out of the gangways and the pumps, and put them on the bank. On the 24th of February, 1862, they served a notice on an agent of the defendants that they would proceed, on February 28th, 1862, to value and appraise the property, under the provisions of the lease of June 10th,

1859. The defendants refused to recognize plaintiffs as tenants. In March, 1862, the defendants served a notice on Burton and the plaintiffs, setting forth the lease of June 10th, 1859; that rent amounting to $225.11 was due; that they had not worked the colliery, and had taken up the iron and the pumps, and that therefore their rights were forfeited. On the 11th of April, Thomas Levis and Francis Spencer, for the plaintiffs, valued the property at $9235. Soon afterward the defendants took adverse possession. There was testimony to the effect that it was upon an understanding between counsel that the position of the parties was to be precisely the same as if the owners had ousted the plaintiffs by force, and also that Seitzinger, the defendant, said that he would take charge of the property and " be accountable for all."

Witnesses for plaintiff testified that the defendants, after obtaining possession, pulled down and hauled away the hoisting engine and breaker, breaker engine, screens, railroad iron, and all the machinery, slope house, and slope engine, hoisting gear, and everything connected with it, blacksmith shop, frame stable, frame office, and block of houses, and the whole thing.

Defendants produced evidence to show that the railroad iron was sold for $567.18, and that the other machinery and iron would be worth to remove not over from $500 to $800. D. S. Althouse, an agent of the defendants, testified that at the sheriff's sale he gave a notice. " It was a notice for rent due, only so far as the personal estate was due, the movable property or loose property. It was a notice given on account of loose property. That was my notice for rent, any money that might come out of the sale of the loose property."

Counsel for the plaintiffs presented certain points, which, with the answers of the court, were as follows:

1. That the title to the personal property, consisting of the breaker, engines, and other fixtures and loose property, erected by the tenants in possession under the several leases given in evidence, sold to plaintiffs by the sheriff, vested in the plaintiffs in this suit by the sheriff's sale 10th January, 1862.

A. This point is affirmed.

2. That the purchasers at such sales had a right to remove the fixtures and personal property bought by them at such sale, and if while in the effort to do so they were interrupted and prevented by the defendant and his agents, and by reason of such interruption prevented, they would not lose their right of property in the property at the mines.

A. This point we affirm.

3. That if the agents of the landlords refused to recog-

[Seitzinger *v.* Marsden *et al.*]

nize the purchasers as tenants, and the purchasers neglected to work the mines, because there was no coal to work, the covenants in the lease of 10th June, 1859, to Burton, were terminated by consent of the parties; and the defendants were bound, if they desired to retain the fixtures at the slope erected under said lease, to appraise the same, and if they neglected and refused, and took possession and retained them, they were guilty of converting the same to their own use.

A. This point we affirm.

4. If there was no coal in the Diamond vein, leased to Burton, the purchasers at the sheriff's sale had a right to dissolve the lease, and remove all the fixtures on the premises erected by the tenants, except such things as were to be left at the end of the term without compensation; and if the defendant took possession of the property as testified to by Howell Fisher, and refused to allow the purchasers to remove the breaker, engines, pumps, iron, railroad iron, and blacksmith shop, and such property as belonged to the purchasers, they were guilty of converting the same, and are liable in this action for their value, with interest from the time of such conversion.

A. If there was a total failure of coal in the vein leased to Burton, the lessee had the right to rescind the lease, and as the plaintiffs were the purchasers at the sheriff's sale, and bought all the right, title, and interest of Burton in the same, they acquired the same rights and privileges that Burton had, subject to the provisions of the lease with the landlords. But whether or not there was such a failure of coal is a question for the jury.

The latter part of this point is affirmed.

Counsel for defendants presented, *inter alia*, certain points, which, with the answers of the Court thereto, were as follows:

3. That, by the terms of said lease, said plaintiffs could not and did not acquire any title to said lease, or to any of the fixtures, part of which the plaintiffs severed, but did not remove, without the consent and approval of the lessors, or the subsequent recognition by said lessors of the plaintiffs as their tenants, and that there is no evidence in this case of such recognition, and that the verdict of the jury must therefore be for the defendant.

6. That there is no liability of the defendant, under the undisputed facts of this case and in this form of action, because,—

1st. There is no evidence of joint liability of the two lessors as tenants in common for any joint receipt of proceeds.

2d. There was no removal of anything from the premises by Althouse, agent of W. Wetherill, until September, 1862,

and then only the railroad iron, and this was long after, under all the undisputed evidence in the case, the defendant, and his co-tenant, Wetherill, were in possession ; and

3d. That, as to any other property, it remained in the position the defendant and his co-tenant found it in the spring of 1862, until the winter of 1863, when it was removed by Christian Frantz, and when the premises described in the lease had been in the adverse possession of said lessors for nearly a year; and

4th. That, under the undisputed evidence in the case, there were no facts that showed *ex æquo et bono*, the defendant should pay any proceeds of the iron or anything else to the plaintiffs.

5th. That the defendant having entered into the possession in the spring of 1862, under a claim of title (even if not perfectly clear title), there can be no presumption of any implication to pay the plaintiffs anything so as to enable them to recover in this form of action.

The 7th and 8th points asked the Court to charge that, under the facts and evidence, plaintiffs were not entitled to recover. The Court reserved the 6th point, refused the others, and charged the jury, *inter alia,* as follows:

" [We say to you that, by virtue of the sheriff's sale of Burton's personal property, the plaintiffs acquired all the right, title, and interest of Burton in and to the property sold.] [If you think from the law as explained and the facts that the plaintiffs have established their right to the property sold by the sheriff, and they have satisfied you that the defendant (by his agents or employés acting within the scope of their authority) received any of this property, and converted it to his own use, with a promise to pay for the same, or through fraud or unfair dealing, then he would be liable for the value of so much (if any) of the property which he received, with interest from the time of such conversion."]

December 10th, 1878, verdict for the plaintiffs for $15,000.

The defendants then made motions for a new trial, in arrest of judgment, and for judgment for defendants, *non obstante veredicto,* which rules the Court discharged, and it ordered judgment upon the verdict, provided the plaintiffs remit the excess above $10,400.

Plaintiffs filed a remittitur, and judgment was entered accordingly.

Defendants then took out a writ of error, and assigned as errors 1st and 2d, the portions of the charge within brackets ; 3d, 4th, 5th, and 6th, the answers to plaintiffs' 1st, 2d, 3d, and 4th points; 7th and 8th, the answers to defendants' 3d and 6th points ; 9th and 10th, the refusal to enter judg-

ment *non obstante veredicto;* 11th and 12th, the answers to defendants' 7th and 8th points.

*Hughes* and *Farquhar*, for plaintiffs in error.

As to the 1st, 2d, 3d, 4th, and 7th assignments, this was error.

1st. Because, if not controlled by the terms of the lease, so much of the fixtures and improvements as were erected by Burton, and could be removed without serious injury or destruction of the freehold, could be sold on execution, but the purchaser acquired title to them absolutely only in case he removed them before the expiration of the term, otherwise he only acquired the right to use them.

If the lease was terminated by forfeiture or otherwise before the fixtures were removed, they became the property of the lessors: Davis *v.* Moss, 38 Penna. St., 352, etc. ; Taylor's Landlord and Tenant, §§ 549–50.

In Pennsylvania, entry by the lessors is not necessary to complete a forfeiture of the lease, when there has been a breach of conditions by lessee: Sheaffer *v.* Sheaffer, 1 Wright, 525.

2d. Because by the terms of the lease of 10th June, 1859, the engines and machinery erected by the lessee were not to belong absolutely to the lessee, but were to remain upon the premises until the expiration of the lease, subject to the right of the lessors to take them at their appraised value.

3d. By its terms plaintiffs could not acquire any title to the lease or its fixtures without the consent and approval of the lessors.

The general rule of law as to the right of tenants to remove trade fixtures cannot contravene an express agreement: Taylor's Landlord and Tenant, § 594; Shell *v.* Haywood, 4 Harris, 523 ; Piper *v.* Martin, 8 Barr, 206.

Where there is a covenant against subletting, an assignee cannot claim the rights of the lessee: Rosenberger *v.* Hallowell, 11 Casey, 369.

5th. This assignment is to the affirming of the plaintiffs' third point, which contains three erroneous propositions, viz.:

I. That the facts that the lessors refused to ˙recognize the plaintiffs, and that there was no coal that plaintiffs could work, terminated the covenants of the lease of 10th June, 1859, by *consent of the parties.*

II. That the defendants were bound to have the fixtures and improvements appraised before taking possession thereof.

III. That the defendants were guilty of converting the fixtures and improvements to their own use.

6th. There is no implied warranty from a lease that the land contains coal: Harlan *v.* Coal and Navigation Co., 11

[Seitzinger *v.* Marsden *et al.*]

Casey, 293; 3 Casey, 430; McKnight *v.* Kreutz, 51 Penna. State, 239.

8th, 9th, 10th, 11th, and 12th. This is an action of assumpsit for goods sold and delivered, money lent, and money had and received, and account rendered. This action cannot be sustained unless there was an express contract, or unless the law will imply a contract. It does not lie for a chattel illegally detained. The plaintiff cannot waive the tort and recover the value of the goods unless the tortfeasor has sold the article and received the money: Willet *v.* Willet, 3 Watts, 277; Bethlehem *v.* The Fire Co., 3 Weekly Notes of Cases, 104; Satterlee *v.* Melick, 26 P. F. Smith, 62, Deysher *v.* Trieble, 14 P. F. Smith, 383; Gray *v.* Griffith, 10 Watts, 431.

*James Ryan, William R. Smith,* and *John W. Ryan,* for defendants in error.

The breaker and the bulk of property, both in quantity and value, were erected under the agreement of 1853, long before the lease of June 10th, 1859, was ever contemplated, and it would have been a palpable error for the Court to have held such property in any manner subject to the terms and conditions of the latter lease.

In respect to the property put up wholly at Burton's expense, under the lease of June 10th, 1859, the defendants contended that the purchasers at the sheriff's sale acquired no rights without the consent of the lessors.

It will not be seriously contended that an agreement that the landlords might have the option to buy the tenant's fixtures at the end of the term, at a valuation to be fixed by three men, to be by the parties selected, gives the landlords any title to the fixtures before they shall have been appraised and accepted by him; much less will it be contended that the tenant who, at his own exclusive cost, has put up such fixtures has no title that a creditor of his can acquire by sheriff's sale: Lemer *v.* Miles, 4 Watts, 330.

OCTOBER 2D, 1882.—STERRETT, J.: This suit was brought by the plaintiffs below, as trustees for laborers and miners employed in the colliery of William Burton, to recover the value of certain personal property sold on an execution against him, and purchased by them in trust for themselves and their associates, which property they allege was taken by the defendant below and converted to his own use. It was, of course, incumbent on them to show title to the property in question, that it was subsequently taken and converted by the defendant, and its value at that time. Testimony tending to prove each of these facts was adduced

and submitted to the jury under instructions, which appear to be free from substantial error. It was clearly shown that they purchased the property at the sheriff's sale, took possession of it, sold a portion, and retained the residue until it passed into the hands of the plaintiffs in error. At the time of sale, Burton was lessee of the colliery, under the leases given in evidence, and the property in question had been put upon the premises and used by him for the purpose of his business. The testimony also tended to show that the right of the sheriff's vendees to the custody and control of the property was contested by defendants below, and, for the purpose of avoiding threatened personal violence, they were permitted to take possession of it, with the understanding that such taking should be considered forcible, and should not prejudice any claim the plaintiffs might have to the value of the property so taken. Whether there was any such understanding or agreement between the parties, by virtue of which the possession was obtained, or not, was a question of fact for the jury. If they found there was, it was their exclusive province to ascertain the terms and conditions thereof. The learned judge accordingly submitted the question to the jury, and instructed them to inquire and determine whether the defendant converted any of the plaintiffs' property to his own use, under a promise to pay them for the same, and, if so, what was its value. He also charged that, by virtue of the sheriff's sale, "the plaintiffs acquired all the right, title, and interest of Burton in and to the property sold" as his; that if under the law, as explained by the Court, and the facts, as found by them, they believed the plaintiffs had established their right to the property; and were further satisfied that defendant (by his agent or employés, acting within the scope of their authority) received any of the property and converted it to his own use, with a promise to pay for the same, or through fraud or unfair dealing, then he would be liable for the value thereof with interest. We think the evidence was not only sufficient to justify the submission of these questions of fact to the jury, but that it would have been error to have withdrawn the case from their consideration by giving binding instructions, as requested in defendant's 3d, 6th, 7th, and 8th points. The several assignments, based upon these matters respectively, are therefore not sustained. Nor is there any merit in the several assignments relating to the title acquired by plaintiffs, as vendees of the sheriff.

The Court was clearly right in saying that, by virtue of the judicial sale, they "acquired all the right, title, and interest of Burton in and to the property sold." And, when

considered in connection with the general charge, the affirmance of plaintiffs' first point conveyed precisely the same idea. There is nothing in either of the leases that would have prevented Burton from using his property on the demised premises before the sale, nor do we think there is anything to prevent those who succeeded to his title from exercising rights of ownership after they came into possession as vendees of the sheriff. In affirming defendant's fourth point (in case the jury found the facts to be as therein stated), the learned judge instructed them that if plaintiffs, after obtaining possession as vendees of the sheriff, went to work to dismantle and destroy the colliery, with the purpose of abandoning the same, they did what they had no right to do, and that they acquired thereby no right to the fixtures when severed. But the facts stated in that point are impliedly negatived by the verdict. The greater part of the property was put upon the demised premises under the lease of 1853, which contains no stipulation or covenant by which the lessors during the term could acquire any right to such improvements as were put upon the premises by the lessee for the purpose of his business, nor did it require the latter to pay royalty on any more coal than was actually prepared for the market. But it is contended that, by virtue of stipulations contained in the lease of 1859, the sheriff's vendees could acquire no rights whatever without the consent or approbation of the lessors, and, in the absence of such consent, they took nothing by their purchase.

One of the stipulations provides for an appraisement of the engine and machinery at the expiration of the lease, and, in case the lessors refuse to take the property at the valuation, the lessee shall not remove the pumping-engine until the lessors put up one for themselves, within the time fixed. Another clause provides that the lease shall not be transferred or mortgaged by the lessee, nor shall the operation of any legal process effect a transfer of the lease without like consent; and, on any breach of these stipulations, the lessee, or those who come into possession of his interest, shall thereafter, during the remainder of the term, pay fifty cents per ton for every ton of coal taken out. It is scarcely necessary to say that, as against execution creditors of the lessee, the lessors' option to buy the tenant's fixtures, at the end of the term, gave them no title to such fixtures until they were appraised and accepted. Nor can it be successfully contended that Burton had no such title to the engine, machinery, etc., which he had set up on the demised premises, for the purposes of his business, as could be seized and sold by his creditors. Such property is personal and may

[Snyder *v.* Elliott.]

be taken in execution; nor is its character changed by an agreement between the tenant and his landlord that in a certain event the latter shall have the privilege of taking it at a valuation, to be fixed by parties chosen for that purpose, unless that event has actually occurred. But if there was any breach of the stipulations above mentioned, it resulted from the sheriff's sale. For that, however, the parties themselves have provided a penalty, to which the lessors should be remitted, rather than be allowed to take the property from the sheriff's vendees without compensation.

The testimony fails to show that Burton had neglected to perform any of the covenants in the lease except in the nonpayment of a small portion of the rent, and that was claimed by the lessors out of the proceeds of the sheriff's sale. There appears to be nothing in the case that would have justified the Court in holding that Burton's title to the property was in any manner extinguished, or lost, so that the sheriff's vendees could acquire nothing by their purchase.

We discover no error in any of the rulings of the Court that calls for a reversal of the judgment.

Judgment affirmed.